UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

FREDERICK TARANTINO,

                            Plaintiff,

                                                            DECISION AND ORDER

                                                            05-CV-6587L

            v.

CITY OF HORNELL,
TIMOTHY AIKEN,
SHAWN HOGAN,
JOE PELYCH,

                            Defendants.
_____


        Plaintiff, Frederick Tarantino, commenced this action under 42 U.S.C. § 1983, against the

City of Hornell, New York (sometimes "City") and three City officials, asserting claims arising out

of defendants' enforcement of a City ordinance imposing certain requirements on the owners of

rental properties within Hornell.  Defendants have moved for summary judgment.


                            **BACKGROUND**

        At the time of the events giving rise to this lawsuit, plaintiff owned two rental properties in

Hornell:  a two-family unit at 175-177 River Street, and another two-family unit at 16-16½

Davenport Street.  Plaintiff also owned a residence in Amherst, New York.  According to plaintiff,

he typically stayed at the Amherst property on weekends, and at 177 River Street on weekdays. Plaintiff's Depo. (Def. Ex. I) at 6-9.

At the time of the relevant events, § 120-1(B) ("the ordinance") of the Code of the City of Hornell ("Code") provided that an owner of rental property within Hornell could not rent the property to tenants unless the owner had a certificate of occupancy ("C.O.") for the property issued by the City's code enforcement officer. Section 120-1(B) further provided that a property owner could not obtain a C.O. unless he first gave the City proof that the property was insured, and that the City was listed as a party to be notified in the event that the insurance policy lapsed or was cancelled. Any owner of rental property was also required to designate a Hornell resident as an agent to accept legal service on the property owner's behalf. Def. Ex. C.

In June 2003, defendant Timothy Aiken, who was the City's code enforcement officer, sent plaintiff a letter reminding him of the requirements of § 120-1(B). The letter stated, in part, that "[t]o date, many landlords are not in compliance with this law; therefore, this letter is to serve as notice that the city will be strictly enforcing this law." Def. Ex. K. Aiken stated that to avoid being in violation of the ordinance, plaintiff should submit the documents required by § 120-1(B). *Id.* Plaintiff does not dispute that he was one of several Hornell landlords who received such letters. *See* Defendants' Statement of Undisputed Material Facts ("DSMF") (Dkt. #28) ¶ 42; Plaintiff's Response to Defendants' Statement of Undisputed Material Facts ("PSMF") (Dkt. #33) ¶ 42. Plaintiff did not respond to, or take any action as a result of, this letter. DSMF ¶ 48; PSMF ¶ 48.

According to plaintiff, he was told by the downstairs tenant at the Davenport Street property in September 2004 that a code enforcement officer had been at the building and had gone into the

upstairs apartment. Plaintiff alleges that he had recently given the upstairs tenants an eviction notice, after they had been there for only a week, because they were "extraordinarily difficult tenants," Dkt. #33-4 ¶ 20. Plaintiff infers from those circumstances that the tenants probably called the officer because they were angry at plaintiff for evicting them. *Id.* ¶ 21.

Defendants contend that there is no evidence that anyone from the Code Enforcement Office entered the upstairs apartment at Davenport Street at around that time period, but they do agree that they did have contact with one of the upstairs tenants. Defendants state that on September 24, 2004, Aiken received a telephone call from one of those tenants, Renee Bayea. The exact reason for her call is unclear, but it appears that she had some sort of complaint about the property. *See* Aiken Aff. (Dkt. #27-5) ¶ 17; DSMF Ex. M. Bayea also allegedly informed Aiken that she had just recently begun renting the apartment at 16½ Davenport Street from plaintiff. DSMF ¶¶ 43, 44; PSMF ¶¶ 43, 44.

Aiken states that because it appeared from Bayea's information that plaintiff had rented the property to her without first obtaining a C.O., Aiken sent plaintiff another letter, dated September 24, 2004, stating that the City's records showed that the Davenport Street property had not been inspected since 1998, and that "prior to the renting of the above-mentioned property, the Code Enforcement Officer must inspect the property and determine if a Certificate of Occupancy can be issued." Aiken Aff. ¶ 17; Def. Ex. N. The letter asked plaintiff to respond within three business days. *Id.* Plaintiff admits that he received this letters, which, like the June 2003 letter, was mailed to him at 177 River Street. Dkt. #33 ¶ 46. Plaintiff did not respond to this letter either, however. *Id.* ¶¶ 48, 49.

Defendants contend that on September 28, 2004, Hornell Police Officer Mike Sexsmith called the Code Enforcement Office and stated that both apartments at Davenport Street were currently occupied, but that there was no C.O. for the property.  Def. Ex. O; Dkt. #33 ¶ 47.  Nine days later, on October 7, 2004, Aiken prepared an information charging plaintiff with "commit[ing] the offense of Renting [the Davenport Street property] without a Certificate of Occupancy," as well as an appearance ticket directing plaintiff to answer that charge.  Def. Ex. P.

The appearance ticket was sent by certified mail addressed to plaintiff at 177 River Street on October 8, 2004.  The envelope was eventually returned by the Postal Service stamped, "UNCLAIMED."  Def. Ex. R.  The envelope also bears markings indicating that delivery was unsuccessfully attempted on October 8, 14, and 24, 2004.  *Id.*

The Hornell Common Council held a regularly scheduled meeting on November 23, 2004. Plaintiff attended the meeting, at which he read into the record a statement that he had prepared concerning what he believed to be the unconstitutionality of the requirements imposed on landlords by § 120-1(B).  Plaintiff's Aff. (Dkt. #33-4) ¶ 26; Def. Ex. X.  Plaintiff cited *Sokolov v. Village of Freeport*, 52 N.Y.2d 341, 343 (1981), in which the New York Court of Appeals held that "the imposition of a penalty upon a landlord for renting his premises without first consenting to a warrantless search violates the property owner's Fourth Amendment rights."  Plaintiff's letter also indicated that if "these violations of civil rights [were not] corrected," the City might find itself faced with "a class action law suit ... ."  Def. Ex. X.

The day after the meeting, the Hornell *Tribune* newspaper ran an article about plaintiff's statements at the meeting.  The article also quoted Hornell Mayor Shawn Hogan as stating, *inter alia*,

that plaintiff was "showboating," and that plaintiff "wouldn't do this if he thought he had a leg to stand on."  Plaintiff's Ex. M.

Aiken (who was not at the November 23 meeting) states in an affidavit that he missed work for much of November 2004, for personal reasons.  When he returned to his office on November 30, Aiken prepared two additional informations charging plaintiff with violating the Code provisions requiring him to designate a local agent to accept service of process on plaintiff's behalf, and to submit proof that plaintiff's properties were covered by fire and liability insurance.  Def. Ex. S. Aiken prepared appearance tickets on those charges, which he made returnable on December 17, 2004.  Def. Ex. T.  Aiken also revised the return date of the as-yet-unserved October 7 appearance ticket to that same date.  Def. Ex. Q.

After preparing the informations and appearance tickets, Aiken called plaintiff at work and arranged to meet with him later that day, November 30.[1]  Plaintiff met Aiken as agreed, at which time Aiken personally served him with the appearance tickets.

Plaintiff appeared in court on November 30 to answer the charges against him, and pleaded not guilty.  In July 2005, the City withdrew the charges.  Amended Complaint ¶ 27; DSMR ¶ 72. It is not clear whether any reason was given for the City's decision.

Also in July 2005, the City amended § 120 of the Code by adding a provision that the Code Enforcement Office "shall be required to obtain a search warrant whenever an owner, agent or person in charge refuses to permit a warrantless inspection of the premises ... ."  Plaintiff's Ex. F § 120-

---

[1]Plaintiff worked at the Hornell office of the New York State Department of Transportation.  It is not clear how Aiken, who states that he had never spoken to plaintiff prior to November 30, 2004, Aiken Aff. (Dkt. #27-5) ¶ 9, knew where plaintiff worked.

1(C)(2).  The amended Code further provides that all rental units "shall be inspected and certified

by the Code Enforcement Office ...," and that "it shall be unlawful and a violation of this chapter to

rent ... any ... rental unit without the inspection and certification as required herein."  *Id.* § 120-

1(C)(1).

Plaintiff commenced this action in November 2005, against the City, Aiken, Hogan, and

Joseph Pelych, who at all relevant times was the Hornell City Attorney.  The amended complaint

(Dkt. #21) asserts six causes of action under § 1983 and New York law:  (1) a claim for malicious

prosecution; (2) a claim captioned, "Invalidation of Unconstitutional Laws," alleging that § 120-1,

both in its current form and as it existed prior to the July 2005 amendment, is unconstitutional in

several respects; (3) a claim alleging that defendants have violated plaintiff's constitutional rights

to free speech, due process, equal protection, and freedom from unlawful searches, as well as

plaintiff's rights under the Contracts Clause of article I, § 10 of the United States Constitution; (4)

a claim alleging "negligent enactment and enforcment [sic] of law"; (5) a slander claim; and (6) a

claim for intentional infliction of emotional distress.  Plaintiff seeks over one million dollars in

compensatory and punitive damages, and a declaration that the relevant sections of the Code are

unconstitutional.


**DISCUSSION**

**I. Fourth Amendment Claim**

The amended complaint alleges that "[d]efendants ... deprived plaintiff of his ... right[] ... to

be free from illegal searches guaranteed ... by the ... Fourth Amendment ... ."  Dkt. #21 ¶ 60.  The

- 6 -

complaint alleges that defendants did so by "entering [plaintiff's] rental property at 16 ½ Davenport Street and conducting an inspection of the property without plaintiff's consent." Dkt. #21 ¶ 66.

Plaintiff's Fourth Amendment claim appears to be based entirely on the alleged entry by a code enforcement officer into the upstairs apartment on Davenport Street in September 2004. Although defendants contend that there is no proof that anyone from the City *ever* searched or even entered the Davenport Street property, any dispute in that regard is immaterial.[2] Assuming the truth of plaintiff's allegations, it is clear that, even if there was a "search" or inspection of the property, no Fourth Amendment violation occurred, because the tenants in possession of the property consented to the search.

The entire factual basis for this claim is plaintiff's allegation that in September 2004, he was told by the downstairs tenant at Davenport Street that a code enforcement officer had been there and had entered the upstairs apartment. Plaintiff alleges, however, that the upstairs tenants had called the Code Enforcement Office with a complaint out of spite, because they were angry at plaintiff for giving them an eviction notice. There is *no* evidence that any City officer entered the property without the consent of *either* plaintiff *or* at least one of the occupants.

To succeed on a Fourth Amendment claim alleging an unlawful search, a plaintiff must demonstrate standing, which requires a showing that he had a reasonable expectation of privacy in the place that was searched. *See Minnesota v. Carter*, 525 U.S. 83, 88 (1998); *Rakas v. Illinois*, 439

---

[2]In their reply brief, defendants state that "the evidence shows that [plaintiff's] rental property was never subjected to a search in 2004." Dkt. #36 at 7. Aiken also testified at his deposition that he did not enter either apartment at the Davenport Street property in 2004, and that to the best of his knowledge no one else from the Code Enforcement Office did either. Def. Ex. H at 75-83.

U.S. 128, 143-44 and n. 12 (1978)); *Warren v. Williams*, No. Civ.A. 304CV537, 2006 WL 860998, at *10 (D.Conn. Mar. 31, 2006); *Godshalk v. Borough of Bangor*, No. Civ.A. 03-1465, 2004 WL 999546, at *10 (E.D.Pa. May 5, 2004).[3]

Plaintiff has not made, and cannot make on the facts presented, such a showing here.  It is well established that a landlord does not have a reasonable expectation of privacy with respect to property that he has rented to a tenant, and that is occupied by that tenant.  *See*, *e.g.*, *Johnson v. Weaver*, 248 Fed.Appx. 694, 697 (6th Cir. 2007) (state department of natural resources officers did not violate property owner's Fourth Amendment rights when they knocked on door of tenant's house, notwithstanding owner's prior order to officers to stay off his property, since the tenant lived there, and plaintiff's "ownership alone d[id] not create a reasonable expectation of privacy"); *Steinhauser v. City of St. Paul*, 595 F.Supp.2d 987, 1006-07 (D.Minn. 2008) (landlords did not have reasonable expectation of privacy in their tenants' apartments, and therefore lacked standing to bring § 1983 claims based on searches of tenants' apartments); *United States v. Cruz*, 475 F.Supp.2d 250, 257 (W.D.N.Y. 2007) ("Ownership of premises alone does not automatically confer standing"); *DiBlasi v. Borough of East Rutherford*, No. 05-1980, 2006 WL 2246374, at *5-*6 (D.N.J. Aug. 3, 2006) (finding *sua sponte* that plaintiff lacked standing to assert Fourth Amendment claims with respect to rental properties that he owned but in which he did not reside, and that even if plaintiff did have standing, "it is clear that no Fourth Amendment violation occurred because the respective

---

[3]Strictly speaking, no Fourth Amendment "search" occurs at all "unless the individual [asserting the Fourth Amendment claim] manifested a subjective expectation of privacy in the object of the challenged search, and society [is] willing to recognize that expectation as reasonable.'" *Palmieri v. Lynch*, 392 F.3d 73, 81 (2d Cir. 2004) (quoting *Kyllo v. United States*, 533 U.S. 27, 33 (2001)) (first brackets added).

tenants at these residences gave consent for the Borough Officers to enter the property"); *Dearmore v. City of Garland*, 400 F.Supp.2d 894, 900 (N.D.Tex. 2005) ("the property owner has no expectation of privacy if the property is leased" to another); *Gardner v. McGroarty*, No. 3:CV-99-1634, 2002 WL 32107213, at *9 (M.D.Pa. Mar. 26, 2002) (city defendants did not violate Fourth Amendment in their search of apartment building owned by plaintiff, where they received the consent of plaintiff's tenants to search the individual apartments).

Plaintiff contends that the City has implicitly recognized his subjective privacy interest by amending § 120-1 to provide that the City must obtain a warrant to search a rental dwelling whenever the "owner, agent or person in charge thereof" refuses to permit a warrantless inspection.[4] That provision was not in effect in September 2004, when the alleged entry occurred, however.

Even if that provision had been in effect at the time, however, it does not give rise to a constitutionally protected expectation of privacy by a landlord with respect to leased premises. As the Court of Appeals for the Tenth Circuit has explained, in the context of a right-to-privacy claim,

> [t]he presence of privacy statutes and regulations may inform our judgment concerning the scope of the constitutional right to privacy. However, such local acts, standing alone, fall far short of the kind of proof necessary to establish a broadly recognized, reasonable expectation of privacy which has been identified by precedent. Thus, plaintiffs cannot rely on state statutes to create a federal constitutional claim.

*Flanagan v. Munger*, 890 F.2d 1557, 1571 (10th Cir. 1989). *See also We Buy, Inc. v. Town of Clarkstown State of New York*, No. 06 Civ. 1794, 2006 WL 3016314, at *6 (S.D.N.Y. Oct. 20, 2006)

---

[4]The Code does not appear to define the term "person in charge." Arguably, a tenant in possession of a dwelling could be considered a "person in charge" of the dwelling, so that the tenant's consent to a warrantless search would be effective, even under the current version of § 120-1. Even if a tenant is not a "person in charge," however, plaintiff's Fourth Amendment claim fails, as explained in the body of this Decision and Order.

(rejecting plaintiff's "argument that the substantive protections of the Fourth Amendment are expanded because more protective state law creates a reasonable expectation of greater privacy").[5]

## II. Equal Protection/"Class of One" Claim

Plaintiff alleges that "[w]hile defendants cited and prosecuted plaintiff for alleged violations of [§ 120-1], defendants did not cite or prosecute other similarly situated rental property owners in the City of Hornell that did not comply with the requirements" of § 120-1, Amended Complaint ¶ 25, and that by doing so, defendants deprived him of his constitutional right to equal protection, Amended Complaint ¶ 63.

The Equal Protection Clause of the Fourteenth Amendment requires the government to treat all similarly situated individuals alike. *City of Cleburn v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). If two individuals are treated differently, despite some facial similarly in their situations, the Constitution requires that there be some rational, legitimate basis for the difference in treatment.

Equal protection challenges are "typically ... concerned with governmental classifications that affect some groups of citizens differently from others." *Engquist v. Oregon Dep't of Agric.*, ___ U.S. ___, 128 S.Ct. 2146, 2152 (2008). "Therefore, individuals pursuing equal protection challenges ordinarily 'allege that they have been arbitrarily classified as members of an identifiable group.'"

---

[5]The most likely explanation for the revision to the ordinance is that it was intended to bring § 120-1 into compliance with *Sokolov*, which held that a municipality could not require a landlord to consent to a warrantless search of his premises as a condition of his being allowed to rent out those premises. *Sokolov* was not concerned with any issues involving *tenants'* consent. Regardless of the reasons behind the 2005 amendment, however, plaintiff has not made out a valid Fourth Amendment claim.

*United States v. Moore*, 543 F.3d 891, 896 (7ᵗʰ Cir. 2008) (quoting *Engquist*, 128 S.Ct. at 2152) (additional internal quotation marks omitted).

A plaintiff can make out an equal-protection claim without showing that he belongs to a protected group, however, if he can show that he had been "irrationally singled out" for discriminatory treatment. *Engquist*, 128 S.Ct. at 2153. Such claims are generally referred to as "selective enforcement" or "class of one" claims. *See, e.g.*, *Kamholtz v. Yates County*, No. 08-CV-6210, 2008 WL 5114964, at *4-*5 (W.D.N.Y. Dec. 3, 2008).

To state a selective-enforcement claim, the plaintiff must allege that, compared with others similarly situated, he was selectively treated, and that "such selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person." *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995); *accord Jones v. J.C. Penny's Dept. Stores, Inc.*, No. 03-CV-920, 2007 WL 1577758, *9 (W.D.N.Y. May 31, 2007). "A plaintiff generally must satisfy both elements to establish a claim of selective enforcement." *Washpon v. Parr*, 561 F.Supp.2d 394, 409 (S.D.N.Y. 2008) (quoting *LaTrieste Rest. v. Village of Port Chester*, 188 F.3d 65, 70 (2d Cir. 1999)); *see also Kamholtz v. Yates County*, No. 08-CV-6210, 2008 WL 5114964, at *5 (W.D.N.Y. Dec. 3, 2008) ("demonstrating that a plaintiff has been treated differently from similarly situated individuals is the *sine qua non* of a ... selective enforcement violation") (internal quotation marks omitted).

"While the Second Circuit has not resolved the question of whether there is truly a distinction between selective enforcement and class of one equal protection theories, courts in this circuit have

repeatedly treated them as distinct theories with distinct elements of proof and have accordingly evaluated them as separate claims." *Sloup v. Loeffler*, No. 05-CV-1766, 2008 WL 3988208, at *14 n. 18 (E.D.N.Y. Aug. 21, 2008) (quoting *Bonenfant v. Kewer*, No. 05cv01508, 2007 U.S. Dist. LEXIS 64104, at *24 (D.Conn. Aug. 30, 2007)); *see also Vassallo v. Lando*, 591 F.Supp.2d 172, 184 n. 9 (E.D.N.Y. 2008) (employing "the slightly different formulations set forth by the Second Circuit for each claim"); *Lavoie-Francisco v. Town of Coventry*, 581 F.Supp.2d 304, 312 (D.Conn. 2008) (selective-enforcement and class-of-one claims are ""two related, yet different, equal protection arguments") (quoting *Cobb v. Pozzi*, 363 F.3d 89, 109 (2d Cir. 2004)).

"Class of one" equal protection claims are governed by the Supreme Court's decision in *Village of Willowbrook v. Olech*, 528 U.S. 563 (2000). In *Olech*, the Court held that to establish a class-of-one equal protection violation, a plaintiff must establish that "he has been treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.* at 564; *see also Clubside, Inc. v. Valentin*, 468 F.3d 144, 158-59 (2d. Cir. 2006). The plaintiff in a class-of-one case uses "the existence of persons in similar circumstances who received more favorable treatment than the plaintiff ... to provide an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose–whether personal or otherwise–is all but certain." *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008).

In addition to the two elements set forth in *Olech*, the Supreme Court recently articulated a third element required to bring a successful class-of-one claim. In *Engquist v. Oregon Dep't of*

- 12 -

*Agriculture*, ___ U.S. ___, 128 S. Ct. 2146 (2008), the Supreme Court held that a class-of-one plaintiff must show that the difference in treatment resulted from non-discretionary state action. The Court explained that "[t]here are some forms of state action ... which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments ... . In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise." *Id.* at 2154; *see also Marino v. Shoreham-Wading River Central School Dist.*, No. ___, 2008 WL 5068639, at *7 (E.D.N.Y. Nov. 20, 2008) (under *Engquist*, a plaintiff asserting a class-of-one claim must establish that the differential treatment resulted from non-discretionary state action); *Sloup*, 2008 WL 3978208, at *15 ("the Supreme Court recently clarified the *Olech* holding by limiting class of one claims in contexts characterized by individualized and subjective determinations") (internal quotation omitted).

Plaintiff in the case at bar does not allege that he was discriminated against based on his membership in a protected group. Instead, he alleges that the City's landlord ordinance was enforced against him but not against other similarly situated property owners. Plaintiff has identified three landlords–Dick Giles, Susan Giles, and Bill Birdsall–whom he claims received more lenient treatment than he, based on their personal friendships or other associations with defendants. Plaintiff also alleges that defendant Pelych himself owns rental property in Hornell, and that he had not been made to comply with § 120-1, because of his position as the city attorney.

Plaintiff alleges that during a Common Council meeting at which the Council was considering the adoption of § 120-1 in 2001, Dick Giles, who resided in North Hornell (a separate

municipality) asked if the requirement that landlords designate a local agent for service of process would apply to him.  Mayor Hogan was reported in the minutes of the meeting as opining that "probably not as the Codes Officer would have no problem in reaching" Giles.  Dkt. #33-3 at 57.  When Brian Miller (who does not appear to have been a City official) "st[ood] to take exception in that leaving it up to the discretion of the Codes Officer opens a 'can of worms' and sa[id] that it should be re-worded," Hogan "retort[ed] that all laws are subject to the discretion of the Law Officer.  Common sense will prevail.  Out of county is the problem of service on the landlords."  *Id.*

Plaintiff also states that he has learned from fellow Hornell landlords Susan Giles and Bill Birdsall that "they received preferential treatment from the City because of their close relationships with Mayor Hogan and Pelych, who represents both Giles and Birdsall."[6]  Plaintiff's Mem. of Law (Dkt. #33-5) at 9.  He alleges that both Susan Giles and Birdsall were charged for failing to designate an agent for service of process, bu that after they complained to Mayor Hogan, the charges were dropped.  Aiken testified at his deposition that after he ticketed Giles and Birdsall, Hogan approached him and told Aiken that Aiken "need[ed] to use discretion" in enforcing that provision, and that "if they [*i.e.*, the non-resident landlords] can be readily reached or if they live within close proximity to the city, that it wasn't necessary that they would have to have an agent."  Dkt. #33-3 at 46-47.[7]

---

[6]It is not clear whether Dick Giles and Susan Giles are related or whether they own any of the same properties.

[7]Aiken also testified that he "disagreed with that, because [he] was enforcing the law the way it was written," and that he played no part in the decision to withdraw the charges against Giles and Birdsall, which was the prosecutor's decision.  Dkt. #33-3 at 47.

Plaintiff alleges, without citation to any evidence in the record, that Susan Giles and Birdsall had "close relationships with Mayor Hogan," Dkt. #33-4 ¶ 53, and that this was a factor in the charges against them being dropped. He also notes that Pelych testified at his deposition that he had "done legal work" in the past for both Susan Giles and Bill Birdsall. Dkt. #33-3 at 68-69.

Plaintiff further alleges that Pelych himself is a Hornell landlord, and that he has never been cited by the City for failing to have a C.O. for his rental property. Pelych testified that he did not have a C.O. for his property in 2004, and that he was not cited by the City for any violation of the C.O. provision. Dkt. #33-3 at 66-67. Aiken also testified that Pelych had never been cited for failing to obtain a C.O., and stated that he did not know if Pelych had a C.O. for his rental property. Dkt. #33-3 at 42-43.

Since plaintiff discusses his claim in terms of both selective enforcement and class-of-one, *see* Dkt. #33-5 at 16, the Court will address both theories. With respect to selective enforcement, plaintiff has failed to show that he and the other landlords that he has identified were similarly situated in all material respects, that he was in fact selectively treated as compared to those other landlords, or that any difference in treatment was motivated by constitutionally impermissible purposes.

First, plaintiff has failed to show that he and the other landlords were similarly situated. *See Vassallo*, 591 F.Supp.2d at 184 (at the summary judgment stage, plaintiff "must present evidence comparing himself to individuals that are similarly situated in all material respects."(internal alterations omitted). Although whether two individuals are similarly situated generally presents a factual issue for a jury, that "rule is not absolute, ... and a court can properly grant summary

judgment where it is clear that no reasonable jury could find the similarly situated prong met."
*Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n. 2 (2d Cir. 2001); *see also Cordi-Allen v. Conlon*, 494 F.3d 245, 251 (1st Cir. 2007) (although "the ultimate determination as to whether parties are similarly situated is a fact-bound inquiry[,] that does not mean that every case ... is a jury case.  To carry the burden of proving substantial similarity, 'plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves'") (quoting *Clubside*, 468 F.3d at 159).

Here, the record shows that the other landlords all resided, if not in Hornell proper, at least in the immediate area.  Plaintiff, on the other hand, although he maintained a Hornell address, also had a residence in Amherst in Erie County, a considerable distance from Hornell.  The evidence, including Hogan's statement that "out of county" landlords were the chief problem in terms of service of process, thus shows that plaintiff and those other landlords were not similarly situated in all material respects.

For that matter, it appears that plaintiff *was* difficult to get in touch with, despite his Hornell address.  Letters that were sent to that address by ordinary mail were not responded to or acknowledged, and the attempt to deliver an appearance ticket to that address by certified mail was unsuccessful, and the ticket was returned by the Postal Service, undelivered.  Those difficulties could only have confirmed the perception that landlords who did not reside full-time in the Hornell area posed a problem with respect to service of process, and that it was important that they designate a local agent for that purpose.

As to the C.O. requirement, when asked why Pelych had never been cited for failing to obtain a C.O. for his rental property, Aiken testified that Pelych had never "had a change of tenant." Dkt. #33-3 at 42.[8]  Plaintiff admits that the enforcement actions taken against him beginning in September 2004 were prompted by a telephone call from one of his tenants to the Code Enforcement Office, in which she stated that plaintiff had just recently begun renting one of his Davenport Street apartments to her.  DSMF ¶¶ 43-45; PSMF ¶¶ 43-45.  As indicated in his September 2004 letter to plaintiff, Aiken also became aware at that time that the Davenport Street property had not been inspected since 1998.

Although Aiken stated that a C.O. was required regardless of whether there had been a change of tenant,  Dkt. #33-3 at 44, the point is that plaintiff and Pelych were *not* "similarly situated in all material respects."  *See Rheingold v. Harrison Town Police Dep't*, 568 F.Supp.2d 384, 395 (S.D.N.Y. 2008).  There is no evidence that Aiken ever received any calls from Pelych's tenants similar to those that he received from plaintiff's, nor is there any evidence that Aiken was ever made aware of any similar changes in Pelych's tenants that might have prompted him to look into whether Pelych was in compliance with the C.O. requirement.[9]

----

[8]Aiken also testified that he did not know whether Pelych had a C.O. for his building or not.  Dkt. #33-3 at 45.  At his deposition, Pelych testified that he did not have a C.O. for his rental property in 2004.  Dkt. #33-3 at 66.

[9]I recognize that, according to Aiken, a C.O. was required regardless of whether there was a change in tenants.  Whether Pelych could or should have been cited for violating the ordinance, however, is not the relevant question.  The issue is whether Pelych and plaintiff were similarly situated in all material respects.  On the undisputed facts before me, I conclude that they were not, as explained above.

- 17 -

Plaintiff has also failed to show that he was treated differently in any material way from Dick Giles, Susan Giles, or Bill Birdsall.  First, Dick Giles's only role in any of this appears to be that he asked a question at a Common Council meeting in 2001 concerning whether the ordinance (which had not yet been adopted) would apply to him.  There is no indication of his particular circumstances, or of any further interactions at all between him and defendants.

As to Susan Giles and Bill Birdsall, plaintiff contends that they were cited for violating the local-agent requirement, but that the charges were later withdrawn.  As plaintiff himself admits, however, the charges against *plaintiff* were also withdrawn, and plaintiff was never penalized in any way for violating the ordinance.  Even if the proceedings against plaintiff progressed further than did those against Giles and Birdsall (and it is not clear that they did), the fact remains that the charges against plaintiff were dropped.  Thus, he cannot show any differential treatment.

Even if plaintiff could show some difference in treatment, however, he has not adduced any evidence that defendants were motivated by "impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure" him.  *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 234 (2d Cir. 2004) (quoting *Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12, 16 (2d Cir. 1999)); *see also Zahra*, 48 F.3d at 683.

First, although plaintiff alleges that the other landlords were treated more leniently than he was because of their personal relationships with Hogan and Pelych, there is scant evidence to support that allegation.  Plaintiff states in his affidavit that he has learned from Giles and Birdsall that "they received preferential treatment from the City because of their close personal relationships with

Mayor Hogan and Pelych," but besides that statement being rank hearsay, plaintiff offers no further particulars of the basis for that assertion, particularly as to Hogan.  Hogan did testify that Susan Giles "came in and asked [Hogan] if [he] would be her agent of record" with respect to the service-of-process provision, and that he "told her no."  Dkt. #36-3 at 6.  When she replied that she could not find anyone to act as her agent of record, Hogan testified, he responded that it was her responsibility to find an agent, not Hogan's.  *Id.*

Hogan also testified that he "see[s] Bill [Birdsall] on a weekly basis for one reason or another," *id.* at 7, but it is clear from his testimony that he meant that these were not social meetings.  Hogan testified that Birdsall is "in city hall a lot," and that Birdsall often lodges complaints "when he feels other people's properties aren't maintained."  *Id.* at 7-8.

While I recognize that the Court may not make credibility determinations on a motion for summary judgment, plaintiff has not come forward with any evidence, aside from his one bald allegation about Giles's and Birdsall's "close personal relationships" with Hogan, to rebut Hogan's testimony, or to show that Hogan's relationship with either Giles or Birdsall went beyond that of mayor and citizen.  That is not enough to create a genuine issue of material fact.  *See SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 138 (2d Cir. 2009) (affidavit opposing motion for summary judgment "must be made on personal knowledge") (quoting Fed. R. Civ. P. 56(e)(1)); *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008) (to defeat a properly supported summary judgment motion, opposing party must proffer admissible evidence setting forth specific facts that show a genuinely disputed, material factual issue).

Even assuming, *arguendo*, that as a personal favor to Giles and Birdsall, Hogan intimated to Aiken that he should not have issued citations to them, that does not show that *plaintiff* was singled out for punishment out of malice, bad faith, or a desire to injure plaintiff.[10]  Since this case does not involve a suspect class or plaintiff's fundamental rights, plaintiff must do more than show that someone *else* was "given a break."  He must show that the actions that were taken against him were motivated by some impermissible animus toward him.  *See Rubinovitz v. Rogato*, 60 F.3d 906, 911 (1st Cir. 1995) (in the absence of invidious discrimination or the abuse of a fundamental right, "the malice/bad faith standard should be scrupulously met") (internal quotation marks omitted); *accord LeClair v. Saunders*, 627 F.2d 606, 611 (2d Cir. 1980); *Inturri v. City of Hartford, Conn.*, 365 F.Supp.2d 240, 252 (D.Conn. 2005) ("Even if the Court assumes that the plaintiffs were intentionally treated differently than similarly situated police officers in the department, the plaintiffs have not set forth any evidence demonstrating that the differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or on a malicious or bad faith intent"), *aff'd*, 165 Fed.Appx. 66 (2d Cir. 2006); *see also Esmail v. Macrane*, 53 F.3d 176, 178-79 (7th Cir. 1995) (distinguishing between an allegation that other persons "committed worse infractions than [plaintiff] was charged with but were let off with lighter or no sanctions," which "would not in itself establish" an equal protection claim, and a claim that municipal officials engaged in "an orchestrated campaign of official harassment directed against [plaintiff] out of sheer malice" and "sheer vindictiveness," which would violate the Equal Protection Clause).

---

[10]Plaintiff's allegation that defendants acted to punish him for exercising his rights under the First Amendment is discussed *infra*.

As to Pelych, he did testify that he had previously served as Giles's attorney, and that he had "done a lot of [legal] work for Bill" Birdsall.  Dkt. #33-3 at 68-69.  He also testified, however, that he "disqualified himself" from any actions involving the citations that were issued to Giles and Birdsall.  *Id.* at 69.

Again, plaintiff has proffered no evidence to the contrary.  His suggestion that "[i]t probably did not hurt Giles or Birdsall" that they had been clients of Pelych, Plaintiff's Decl. (Dkt. #33-4) ¶ 58, certainly does not constitute the kind of admissible evidence that is required to demonstrate the existence of a genuine issue of material fact.  *See Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir.) ("evidence ... must be based on more than mere speculation, conjecture, or surmise.  Unsubstantiated allegations carry no probative weight in summary judgment proceedings") (citation and quotations omitted), *cert. denied*, 549 U.S. 856 (2006); *Kizer v. Children's Learning Ctr.*, 962 F.2d 608, 613 (7th Cir. 1992) ("supposition and conjecture" insufficient to defeat motion for summary judgment).

For many of the same reasons given with respect to plaintiff's selective-enforcement claim, I find that plaintiff cannot make out a class-of-one equal protection claim.  As stated, these two types of claims are closely related.  *See Cobb*, 363 F.3d at 109 (class-of-one claims and selective-prosecution claims are based on "two related, yet different, equal protection arguments"); *Inturri*, 365 F.Supp.2d at 252.

To the extent that plaintiff's equal protection claim is based on a class-of-one theory, however, several points bear mentioning.  First, to succeed on a class-of-one claim, plaintiff "must show an extremely high degree of similarity between [himself] and the persons to whom [he] compare[s himself]."  *Osborne v. Fernandez*, No. __, 2009 WL 884697, at *40 (S.D.N.Y. Mar. 31,

2009) (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006)).  In fact, the Second

Circuit has stated that the plaintiff "must demonstrate that [he was] treated differently than someone

who is *prima facie* identical in all relevant respects."  *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d

Cir. 2005) (internal quote omitted), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138

(2d Cir. 2008); *see, e.g.*, *Doninger v. Niehoff*, 594 F.Supp.2d 211, 227-28 (D.Conn. 2009).  For the

reasons stated, plaintiff has not done so.

Second, in a class-of-one case, the plaintiff must show that the difference in treatment

resulted from non-discretionary governmental action.  *Engquist*, 128 S.Ct. at 2154; *Crippen v. Town*

*of Hempstead*, No. 07-CV-3478, 2009 WL 803117, at *4 (E.D.N.Y. Mar. 25, 2009);  *Alsaifullah v.*

*Carter*, No. 06-CV-1481, 2009 WL 455442, at *3 (N.D.N.Y. Feb. 23, 2009).[11]  Enforcement of the

Code provisions at issue here clearly involved a degree of discretion on the part of the code

enforcement officer, Aiken.  *See Engquist*, 128 S.Ct. at 2154 (using a police officer's decision to

ticket some drivers, but not others, for speeding, as an example of a discretionary decision, with

respect to which a class-of-one theory is a "poor fit"); *Flowers v. City of Minneapolis, Minn.*, 558

F.3d 794, 799-800 (8th Cir. 2009) ("A police officer's decisions regarding whom to investigate and

how to investigate are matters that necessarily involve discretion"); *Nasca v. Town of Brookhaven*,

No. 05-CV-122, 2008 WL 4426906, at *11 n.4 (E.D.N.Y. Sept. 25, 2008) ("to the extent plaintiff

is challenging the discretionary decisions by the Town as to the enforcement of its permit laws and

---

[11]Although *Engquist* was decided in public-employment context, and neither the Supreme
Court nor the Second Circuit has decided whether its reasoning applies outside that context, other
circuits and at least one other district court in this circuit have done so, as I do here.  *See, e.g.*,
*Flowers v. City of Minneapolis, Minn.*, 558 F.3d 794, 799-800 (8th Cir. 2009); *United States v.*
*Moore*, 543 F.3d 891, 901 (7th Cir. 2008); *Douglas Asphalt Co. v. Qore, Inc.*, 541 F.3d 1269,
1274 (11th Cir. 2008); *Crippen*, 2009 WL 803117, at *5; *Vassallo*, 591 F.Supp.2d at 188.

code provisions, *Engquist* suggests that 'class of one' challenges cannot be asserted as to such decisions").[12]

Although this claim must therefore be dismissed against all the defendants, I also note that plaintiff concedes that defendant Pelych is absolutely immune from suit to the extent that plaintiff's claims against Pelych arise out of any prosecutorial acts taken by Pelych in his role as city attorney. *See* Plaintiff's Supp. Mem. of Law (Dkt. #46) at 6; *Imbler v. Pachtman*, 424 U.S. 409, 430-431 (1976); *Parkinson v. Cozzolino*, 238 F.3d 145, 150 (2d Cir. 2001).

## III. Facial Challenge to the Ordinance

In addition to his equal protection claims based on alleged unequal treatment of plaintiff as compared to other local landlords, plaintiff alleges that the ordinance is unconstitutional because it is not rationally related to any legitimate governmental interests. In other words, in addition to his "as applied" challenge to the ordinance, plaintiff asserts a facial challenge as well.

Plaintiff concedes that because he does not allege that the ordinance targets any suspect class or fundamental right, its constitutionality is judged under the "rational basis" test. *See* Plaintiff's

---

[12]The *Engquist* Court also explained that

[o]f course, an allegation that speeding tickets are given out on the basis of race or sex would state an equal protection claim, because such discriminatory classifications implicate basic equal protection concerns. But allowing an equal protection claim on the ground that a ticket was given to one person and not others, even if for no discernible or articulable reason, would be incompatible with the discretion inherent in the challenged action. It is no proper challenge to what in its nature is a subjective, individualized decision that it was subjective and individualized.

128 S.Ct. at 2154. As stated, there is no claim in the case at bar that plaintiff was singled out because of his membership in any protected category.

Mem. of Law (Dkt. #33-5) at 18.   Under that test, the challenged ordinance "will not be held unconstitutional if its wisdom is at least fairly debatable and it bears a rational relationship to a permissible state objective."   *Greene v. Town of Blooming Grove*, 879 F.2d 1061, 1063 (2d Cir. 1989).

In undertaking that analysis, the Court may consider whether the ordinance is rationally related to its stated purpose, but "that is ultimately not determinative, and in fact it is not necessary for defendants to enunciate any purpose" for the ordinance.   *Ecogen, LLC v. Town of Italy*, 438 F.Supp.2d at 157 (citing *Panama City Med. Diagnostic Ltd. v. Williams*, 13 F.3d 1541, 1546 (11th Cir. 1994)).   Instead, "the proper inquiry is concerned with the *existence* of a conceivable rational basis, not whether that basis was actually considered by the legislative body."   *Id.* (quoting *Haves v. City of Miami*, 52 F.3d 918, 922 (11th Cir. 1995)); *see also Williams v. Morgan*, 478 F.3d 1316, 1320 (11th Cir.) ("A statute is constitutional under rational basis scrutiny so long as 'there is *any reasonably conceivable state of facts* that could provide a rational basis for the [statute]'") (quoting *FCC v. Beach Comm'ns, Inc.*, 508 U.S. 307, 313 (1993) (alterations in original), *cert. denied*, 128 S.Ct. 77 (2007); *WMX Technologies, Inc. v. Gasconade County, Missouri*, 105 F.3d 1195, 1201 (8th Cir. 1997) (in adjudicating a constitutional challenge to an ordinance, "we do not inquire into the methods and motives behind its passage.   We ask only whether a *conceivable* rational relationship exists between the ordinance and legitimate governmental ends") (emphasis added).

Thus, as the party challenging the ordinance, plaintiff has the burden to "negative every conceivable [rational and legitimate] basis which might support" the ordinance.   *Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 75 (2001) (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)).   That burden

is a heavy one.  *Doe v. Michigan Dep't of State Police*, 490 F.3d 491, 504 (6ᵗʰ Cir. 2007); *Mostowy v. United States*, 966 F.2d 668, 672 (Fed. Cir. 1992); *Genesee Scrap Tin and Baling, Co. v. City of Rochester*, 558 F.Supp.2d 432, 434 (W.D.N.Y. 2008); *Ecogen*, 461 F.Supp.2d at 104; *see also United States v. Salerno*, 481 U.S. 739, 745 (1987) (to show that legislative act is unconstitutional, "challenger must establish that no set of circumstances exists under which the Act would be valid"). In addition, a "classification does not fail rational-basis review because it 'is not made with mathematical nicety or because in practice it results in some inequality.'"  *Heller*, 509 U.S. at 321 (quoting *Dandridge v. Williams*, 397 U.S. 471, 485 (1970)).

Here, there are several apparent legitimate interests underlying the ordinance.[13]  The minutes of the 2001 Common Council meeting at which § 120-1 was amended to provide for C.O., insurance and agent requirements indicate that:  the City "ha[d] determined that absentee landlords [we]re a problem within the City of Hornell"; "it ha[d] been reported to the Common Council for the City of Hornell that it is difficult to serve various absentee landlords with legal process in that they cannot be located"; the Common Council was of the opinion "that the failure to contact absentee property owners ha[d] adversely affected the health and safety of the Citizens of the City of Hornell"; and the

_____

[13]As stated, the ordinance was amended in certain respects in 2005.  Some of those amendments (such as the requirement that the City obtain an administrative warrant if a landlord refuses to give consent to search) relate directly to the issues in this case.

To the extent that plaintiff's facial challenge to the ordinance (as opposed to his as-applied challenge) implicates provisions that were amended in 2005, his challenge is necessarily confined to the ordinance as it is now written.  Any claim of facial unconstitutionality with respect to earlier versions of the ordinance is moot.  *See Khodara Envtl., Inc. v. Beckman*, 237 F.3d 186, 195-96 (3d Cir. 2001); *Granite State Outdoor Advertising, Inc. v. City of St. Pete Beach*, 322 F.Supp.2d 1335, 1341-42 (M.D.Fla. 2004).  Therefore, the provisions permitting nonconsensual, warrantless searches, and prohibiting landlords from collecting rent on non-compliant property until the issuance of a C.O., are not at issue with respect to this claim.

Common Council "wishe[d] to establish a procedure whereby a local individual can be notified in the event that a landlord is unable to be found ... ."  Def. Ex. D at 51.

That those are legitimate governmental interests cannot seriously be disputed.  Plaintiff, however, contends that even if defendants have shown some legitimate governmental interests, the ordinance is not rationally related to those interests.  Plaintiff argues, for example, that there is no rational reason why an owner of rental property who lives in New York State, but not in Hornell, should be required to designate a Hornell resident to accept service of process on his behalf, since New York law provides for statewide service of process in such situations.  Plaintiff also advances several arguments why, in his view, the insurance requirements do not serve any legitimate governmental purpose.

These arguments require little comment.  As the Second Circuit has explained, "[r]ational basis review is deferential.  'Rational basis review does not pass judgment upon the wisdom, fairness, or logic of legislative decisions; it turns on whether there are "plausible" reasons for [the legislative body]'s choices.'"  *Weinstein v. Albright*, 261 F.3d 127, 140 (2d Cir. 2001) (quoting *General Media Comm., Inc. v. Cohen*, 131 F.3d 273, 286 (2d Cir. 1997), *cert. denied*, 524 U.S. 951 (1998)).  *See also Lewis v. Thompson*, 252 F.3d 567, 590 n.33 (2d Cir. 2001) (describing rational-basis review as "highly deferential"); *United States v. Watson*, 483 F.3d 828, 835 (D.C. Cir. 2007) (same); *Williams v. Pryor*, 240 F.3d 944, 948 (11th Cir. 2001) ("Almost every statute subject to the very deferential rational basis ... standard is found to be constitutional").

Given that standard, the ordinance at issue here easily passes constitutional muster.  The requirements imposed on landlords clearly bear some rational connection to the legitimate ends to

be served by the ordinance.  Whether the ordinance could have been "better" drafted or more finely tuned is not the issue, nor is it the role of the Court to decide whether I would have drafted it in the exact same way.  Since I cannot say that the ordinance is "wholly irrational," *Smart v. Ashcroft*, 401 F.3d 119, 123 (2d Cir. 2005), *Owens v. Parrinello*, 365 F.Supp.2d 353, 359 (W.D.N.Y. 2005), plaintiff's facial challenge to the ordinance must be dismissed.  *See Powers v. Harris*, 379 F.3d 1208, 1217 (10th Cir. 2004) (court engaging in rational-basis review may not "speculate as to whether some other scheme could have better regulated the evils in question"), *cert. denied*, 544 U.S. 920 (2005); *Palmieri v. Town of Babylon*, No. 01 CV 1399, 2006 WL 1155162, at *7 (E.D.N.Y. Jan. 6, 2006) (stating that town's rental permit law was "rationally related to its purpose of furthering safety.  No further analysis of the law is necessary to dismiss Plaintiff's claim that the Rental Permit Law on its face violates the Equal Protection Clause").

## IV. Due Process Claim

The complaint alleges that "[d]efendants ... deprived plaintiff of his federally protected civil right[] to ... due process ... ."  Dkt. #21 ¶ 60.  Plaintiff alleges that defendants did so by "commencing and continuing prosecution of him without first affording him an opportunity for a hearing with regard to the charges levied against him and by charging him with a violation(s) they knew or should have known was not sustainable under the law."  *Id.* ¶ 62.

Defendants contend that to the extent that plaintiff attempts to assert a procedural due process claim, this claim should be dismissed because the undisputed facts show that plaintiff received all the process which he was due, including notice and an opportunity to be heard.  Defendants also

contend that plaintiff cannot show "conscience-shocking" action giving rise to a substantive due process claim.

Plaintiff does not appear to be pursuing this claim, as neither his initial nor supplemental memorandums of law (Dkt. #33-5, #46) address it.  In any event, I see no basis for a due process claim here.

Plaintiff has cited no authority that he is entitled to notice or an opportunity to be heard *before* charges are brought against him.  All that is required is that he receive notice and an opportunity to be heard before being *deprived* of a protected liberty or property interest.  *See McKesson Corp. v. Division of Alcoholic Beverages and Tobacco, Dep't of Bus. Reg. of Florida*, 496 U.S. 18, 37 (1990) *Marco Outdoor Advertising, Inc. v. Regional Transit Auth.*, 489 F.3d 669, 673 (5th Cir. 2007).

Since the charges here were eventually dropped, plaintiff was not deprived of any such interest.  Furthermore, the record shows that he *was* given notice and an opportunity to be heard.

I also agree with defendants that plaintiff's allegations and the evidence do not show that any actions taken by defendants constituted the type of egregious conduct necessary to make out a substantive due process claim.  *See Arar v. Ashcroft*, 532 F.3d 157, 204 (2d Cir. 2008) ("Principles of substantive due process apply only to a narrow band of extreme misbehavior by government agents acting under color of law:  mistreatment of a person that is 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience'") (quoting *Lombardi v. Whitman*, 485 F.3d 73, 79 (2d Cir. 2007)).

- 28 -

## V. First Amendment Claim

Plaintiff's First Amendment claim is based on his allegation that the charges brought against him on November 30, 2004 were motivated by retaliation for plaintiff's having spoken out against the ordinance at the November 23 Common Council meeting.  This claim, however, suffers from several fatal defects.

First, in *Hartman v. Moore*, 547 U.S. 250 (2006), the Supreme Court held that where a plaintiff asserts a claim of retaliatory prosecution under § 1983, the absence of probable cause "must be pleaded and proven" as an element of the claim.  *Id.* at 265-66.  In so holding, the Court agreed with the position that had been taken by several courts of appeals, including the Second Circuit.  *See id.* at 255-56 (citing *Mozzochi v. Borden*, 959 F.2d 1174, 1179-1180 (2d Cir. 1992)).  *See also Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001) ("because defendants had probable cause to arrest plaintiff, an inquiry into the underlying motive for the arrest need not be undertaken").

In the case at bar, plaintiff contends that Aiken lacked probable cause to believe that he was in violation of the requirement that landlords designate a Hornell resident as an agent to accept service of process on the landlord's behalf.  Specifically, plaintiff contends that the proof shows that he was in fact a Hornell resident in November 2004 and that Aiken lacked probable cause to believe otherwise.

I disagree.  First, although plaintiff contends that the Code "requires landlords who reside outside of the City of Hornell to designate a City resident as agent for receipt of service of process," Plaintiff's Mem. of Law (Dkt. #33-5) at 14, by its terms the agent requirement applies to "any and all landlords/property owners ... ."  *See* Def. Ex. C § 120-1(B)(4).

At his deposition, Aiken did agree that "[t]he requirement to designate an agent ... applied to nonresident owners ...," Def. Ex. H at 114, and it may have been his subjective understanding that it was not intended to be enforced against property owners who resided in Hornell, but that is not what the ordinance says. "Probable cause is to be assessed on an objective basis," *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007), and objectively speaking probable cause did exist to believe that plaintiff was in violation of the agent requirement; in fact, plaintiff does not appear to dispute that he had *not* appointed an agent as required by the ordinance.[14]

Second, even if the local-agent requirement did apply only to nonresident landlords, it is important to remember here that the operative question is not whether plaintiff was actually in violation of the ordinance, but whether Aiken had probable cause to believe that he was. As the Supreme Court has explained, that is not a particularly demanding standard:

> As early as *Locke v. United States*, 7 Cranch 339, 348, 3 L.Ed. 364 (1813), Chief Justice Marshall observed, in a closely related context: "[T]he term 'probable cause,' according to its usual acceptation, means less than evidence which would justify condemnation ... . It imports a seizure made under circumstances which warrant suspicion." More recently, we said that "the quanta ... of proof" appropriate in ordinary judicial proceedings are inapplicable to the decision to issue a warrant. *Brinegar*[ *v. United States*], 338 U.S. [160], at 173 [(1949)]. Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the [probable-cause] decision."

*Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quoting *Illinois v. Gates*, 462 U.S. 213, 235 (1983)).

---

[14]It was at the meeting at which the agent requirement was adopted in 2001 that Mayor Hogan opined, in response to a question from a local landlord, that the agent requirement would generally not be enforced against landlords who lived in or near Hornell, because "[o]ut of county is the problem of service on the landlords." To the extent that plaintiff contends that the provision was not enforced against landlords who lived in the area, that bears upon his equal protection claims, which are discussed elsewhere in this Decision and Order. But again, Hogan's opinions in this regard do not change the facts that, regardless of where plaintiff actually lived, the ordinance did apply to him, and he was in apparent violation of the agent requirement.

Although probable cause requires more than a "hunch," *Daniels v. D'Aurizo*, 564 F.Supp.2d 194, 197 (W.D.N.Y. 2008), "the standard for establishing probable cause is not a particularly stringent one.  It does not require proof of … guilt beyond a reasonable doubt.  Instead, probable cause to [bring charges against a person] exists when the known facts are 'sufficient to warrant a person of reasonable caution in the *belief* that the person to be [charged is violating the law].'" *Donovan v. Briggs*, 250 F.Supp.2d 242, 253 (2003) (quoting *Jocks v. Tavernier*, 316 F.3d 128, 135 (2d Cir. 2003).  *See also Loria v. Gorman*, 306 F.3d 1271, 1288-89 (2d Cir. 2002) ("probable cause is an assessment of probabilities, not an ascertainment of truths").  Where the facts are undisputed, the presence or absence of probable cause presents an issue of law to be determined by the court. *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007).

 In the case at bar, Aiken testified that he had previously attempted to serve an appearance ticket upon plaintiff in person at plaintiff's River Street address in Hornell, and that no one ever answered the door.  Def. Ex. Z at 125.  Aiken also knew that attempts to serve plaintiff by certified mail sent to the River Street address had been unsuccessful, and that the mail had been returned as "unclaimed."  In addition, Aiken had been told by someone in his office that plaintiff actually resided in Canisteo.  Def. Ex. H at 115.

While those facts may not have established conclusively that plaintiff was not a Hornell resident, taken together they were sufficient to warrant a reasonable person in believing that he was not.  Since the River Street building was one of plaintiff's two rental properties in Hornell, it was objectively reasonable for Aiken to conclude that plaintiff had simply listed it as a mailing address but that he did not actually reside there.

- 31 -

Third, regardless of the applicability to plaintiff of the local-agent requirement, there was clearly probable cause to believe that plaintiff was in violation of the requirement that he submit proof that his rental properties were covered by fire and liability insurance.  There is no suggestion that this requirement was limited, either by the terms of the ordinance or in practice, to nonresident landlords, and plaintiff does not appear to contend that he had submitted such proof of coverage.

Plaintiff's First Amendment claim also suffers from yet another fatal defect:  he cannot show that the issuance of the appearance tickets on November 30, 2004 actually chilled plaintiff's exercise of his First Amendment rights.

"To prevail on this free speech claim, plaintiff must prove:  (1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right." *Curley*, 268 F.3d at 73 (citing *Connell v. Signoracci*, 153 F.3d 74, 79 (2d Cir. 1998)).  With respect to the third element, plaintiff must show that his First Amendment rights were "actually chilled." *Curley*, 268 F.3d at 73. (citing *Davis v. Village Park II Realty Co.*, 578 F.2d 461, 464 (2d Cir. 1978)).  In that regard, "[t]he Supreme Court has held that '[a]llegations of a subjective "chill" are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.'" *Curley*, 268 F.3d at 73 (quoting *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972)).

"Where a party can show no change in his behavior, he has quite plainly shown no chilling of his First Amendment right to free speech." *Curley*, 268 F.3d at 73.  In *Curley*, for example, the court noted that despite the plaintiff's charge that he was arrested in retaliation for certain comments he made during the 1993 mayoral campaign, he continued his 1994 campaign for village trustee even

after the arrest and ran again for village public office in 1995.  The Second Circuit held that the

plaintiff's First Amendment claim therefore failed, stating that "[a]lthough plaintiff insists that his

1995 campaign was affected by his arrest–namely, that it was demoralized and only amounted to a

token effort–the fact remains that Curley chose to run for public office even after the events of

August 1994."  *Id.  See also Singer v. Fulton County Sheriff*, 63 F.3d 110, 120 (1995) (finding no

chilling effect where, after an arrest, the plaintiff continued to publish his newspaper through which

he criticized the village government), *cert. denied*, 517 U.S. 1189 (1996).

In the case at bar, plaintiff has not presented any evidence that he changed his behavior in

any way after Aiken served him with the appearance tickets at their meeting on November 30, 2004.

Absent such evidence, plaintiff cannot establish that his First Amendment rights were "actually

chilled."  *See Spear v. Town of W. Hartford*, 954 F.2d 63, 67 (2d Cir.) (affirming Rule 12(b)(6)

dismissal on the grounds that plaintiff had not alleged an actual chilling effect and, in fact, had

admitted that he had not changed his behavior at all as a result of town's allegedly adverse actions),

*cert. denied*, 506 U.S. 819 (1992).[15]


## VI. Malicious Prosecution

To state a 42 U.S.C. § 1983 claim for malicious prosecution, the plaintiff must allege the four

elements of malicious prosecution under New York state law.  *Rohman v. New York City Transit

Auth.*, 215 F.3d 208, 215 (2d Cir. 2000).  Those elements are:  "(1) that the defendant commenced

---

[15]I also note that the first appearance ticket was issued to plaintiff in October 2004, weeks before plaintiff spoke out at the Common Council meeting.  While that does not in itself mean that the November 30 tickets could not have been issued in retaliation for plaintiff's speech at the November 23 meeting, it does tend to further undercut his First Amendment claim.

or continued a criminal proceeding against [the plaintiff]; (2) that the proceeding was terminated in the plaintiff's favor; (3) that there was no probable cause for the proceeding; and (4) that the proceeding was instituted with malice." *Rothstein v. Carriere*, 373 F.3d 275, 282 (2d Cir. 2004); *accord Kinzer v. Jackson*, 316 F.3d 139, 143 (2d Cir. 2003).

In addition, to make out a § 1983 malicious prosecution claim, there must also be a showing of a "sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman*, 215 F.3d at 215. *See also Kinzer*, 316 F.3d at 143 ("To sustain a § 1983 claim of malicious prosecution, a plaintiff must demonstrate conduct by the defendant that is tortious under state law and that results in a constitutionally cognizable deprivation of liberty").

Plaintiff's claim of malicious prosecution fails in a number of respects.  First, as explained in connection with the First Amendment claim, I find that probable cause did exist for the issuance of the appearance tickets.

Second, plaintiff has failed to show that the proceedings against him in connection with the charged violations "terminated in his favor."  *See Heck v. Humphrey*, 512 U.S. 477, 484 (1994) ("One element that must be alleged and proved in a malicious prosecution action is termination of the prior criminal proceeding in favor of the accused."); *O'Brien v. Alexander*, 101 F.3d 1479, 1484 (2d Cir. 1996) (one element of malicious prosecution claim in New York is that the criminal proceeding against the plaintiff ended "in favor of the plaintiff").

"Proceedings are terminated in the plaintiff's favor 'only when their final disposition is such as to indicate that the accused is not guilty.'"  *Corbett v. Dwyer*, 345 F.Supp.2d 237, 241 (N.D.N.Y.

2004) (quoting *DiBlasio v. City of New York*, 102 F.3d 654, 658 (2d Cir. 1996)).  In that regard, the

New York Court of Appeals has stated that

> [a] termination is not favorable to the accused ... if the charge is withdrawn or the prosecution abandoned pursuant to a compromise with the accused.  Indeed, it is hornbook law that 'where charges are withdrawn or the prosecution is terminated ... by reason of a compromise into which [the accused] has entered voluntarily, there is not sufficient termination in favor of the accused[.]' ")

*Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 196-97 (2000) (citation omitted).

"[I]t is the plaintiff's burden to show that the prosecution was disposed of in his favor."

*Amaker v. Coombe*, No. 96 CIV. 1622, 1998 WL 637177, at *8 (S.D.N.Y. Sept. 16, 1998); *see also*

*Garrett v. Port Auth. of New York and New Jersey*, No. 04 CIV. 7368, 2006 WL 2266298, at *4

(S.D.N.Y. Aug. 8, 2006) ("Under New York law, the plaintiff in a malicious prosecution claim bears

the burden of establishing that the underlying action terminated in his favor") (citing *MacFawn v.*

*Kresler*, 88 N.Y.2d 859 (1996)).

Plaintiff has not met that burden here.  All that he has shown is that the City eventually

withdrew the charges against him.  Thus, there is no factual basis upon which a factfinder could

conclude that the proceedings were terminated in plaintiff's favor for purposes of a § 1983 claim.

Yet another reason why this claim must fail is that plaintiff has not shown that his *federal*

rights were violated.  As stated, in addition to the elements of a malicious prosecution claim under

New York law, to make out a § 1983 claim, plaintiff must also demonstrate that he was deprived of

a constitutionally protected liberty interest as a result of defendants' actions.  *Rohman*, 215 F.3d at

215.

Plaintiff has not done so.  The undisputed facts show that plaintiff was never taken into custody in connection with the charges against him.  He simply appeared in court to enter a not-guilty plea, and the charges were eventually dropped.  That does not give rise to a § 1983 claim.  *See Rutigliano v. City of New York*, No. 08-0531-cv, 2009 WL 1174657, at *3 (2d Cir. May 1, 2009) ("because, having been released within minutes of the beginning of his arraignment, [plaintiff] has failed to plead facts indicating a 'sufficient post-arraignment liberty restraint,' his § 1983 malicious prosecution claim was appropriately dismissed") (quoting *Rohman*, 215 F.3d at 215); *Jennis v. Rood*, No. 07-0545-pr, 2009 WL 393412, at *2 (2d Cir. Feb. 17, 2009) (malicious prosecution claim was properly dismissed where plaintiff "d[id] not allege that the indictment on attempted assault charges caused a 'post-arraignment restraint of liberty'") (quoting *Rohman*, 215 F.3d at 216); *Richardson v. New York City Health and Hospitals Corp.*, No. 05CIV6278, 2009 WL 804096, at *15 (S.D.N.Y. Mar. 25, 2009) (plaintiff's "single court appearance was not a Fourth Amendment 'seizure' caused by the initiation of criminal proceedings, and these events cannot support a constitutional claim for malicious prosecution"); *Jouthe v. City of New York*, No. 05-CV-1374, 2009 WL 701110, at *10 n.10 (E.D.N.Y. Mar. 10, 2009) ("The Second Circuit has held that this [deprivation of liberty] requirement is satisfied through an arrest pursuant to a warrant or, where the arrest is not pursuant to a warrant, any post-arraignment deprivation of liberty") (citing *Singer*, 63 F.3d at 116-17).

## VII. Contracts Clause

Plaintiff alleges that the ordinance deprived him "of his constitutional rights under the Contracts Clause of the United States Constitution to enter into a private contract of insurance." Dkt.

#21 ¶ 49.  He also alleges that the current version of the ordinance violates his "rights ... under the Contracts Clause ... to enter into a contract to lease his property in exchange for rental payments." *Id.* ¶ 55.

Defendants contend that there is no private right of action under § 1983 for a violation of the Contracts Clause.  In support of that assertion, defendants cite a dissenting opinion by Justice Kennedy in *Dennis v. Higgins*, 498 U.S. 439 (1991), stating that "[i]n our only previous case discussing a § 1983 claim brought for the violation of a supposed right secured by Article I of the Constitution, we held that violation of the Contracts Clause does not give rise to a § 1983 cause of action."  *Id.* at 457 (citing *Carter v. Greenhow*, 114 U.S. 317 (1885)).

The law in this area is not clear-cut, however.  In a case decided after *Dennis*, the Court of Appeals for the Ninth Circuit has stated that "[t]he right of a party not to have a State, or a political subdivision thereof, impair its obligations of contract is a right secured by the first article of the United States Constitution.  A deprivation of that right may therefore give rise to a cause of action under section 1983."  *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 886-87 (9th Cir. 2003).  In addition, the Second Circuit has stated that "it is not clear that suits for violations of the Contract Clause may be brought under section 1983 ... ."  *Haley v. Pataki*, 106 F.3d 478, 482 n. 2 (2d Cir. 1997) (citing *Carter* and *Dennis*).  *See also Lipscomb v. Columbus Mun. Separate School Dist.*, 261 F.Supp.2d 626, 631 (N.D.Miss. 2003) ("Contracts Clause rights fall within the protection of § 1983").

Assuming *arguendo* that a Contracts Clause violation is remediable through § 1983, however, no such claim is viable here.  The ordinance has in no way impaired plaintiff's ability to

enter into an insurance contract; it simply sets forth certain conditions, some of which involve property insurance, before the City will issue a C.O. for rental property.

Plaintiff's claim that the ordinance violates his right "to enter into a contract to lease his property in exchange for rental payments" is also meritless. "When one asserts a violation of the Contracts Clause, therefore, one is required to show three elements: (1) there is a contractual relationship; (2) there has been a change in law that impairs that relationship; and (3) the impairment is substantial and unjustified." *Lyn v. Incorporated Village of Hempstead*, No. 03-CV-5041, 2007 WL 1876502, at *7 (E.D.N.Y. June 28, 2007) (citing *General Motors Corp. v. Romein*, 503 U.S. 181, 185-86 (1992)).[16] Plaintiff has not presented facts indicating that the ordinance has impaired an existing contractual relationship between plaintiff and his tenants, nor has he shown that the requirements and restrictions imposed by the ordinance are "unjustified." *See Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 503 (1987) ("[I]t is to be accepted as a commonplace that the Contract Clause does not operate to obliterate the police power of the States") (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 241-242 (1978)); *Exxon Corp. v. Eagerton*, 462 U.S. 176, 190 (1983) ("This Court has long recognized that a statute does not violate the Contract Clause simply because it has the effect of restricting, or even barring altogether, the performance of duties created by contracts entered into prior to its enactment"); *Manigault v. Springs*, 199 U.S. 473, 480

---

[16]The court in *Lyn* granted summary judgment for the defendants on the merits of the plaintiff's § 1983 claim alleging a violation of the Contracts Clause. It does not appear that any party in that case raised the issue of whether such a claim is cognizable under § 1983.

(1905) (government's police power "to protect the lives, health, morals, comfort and general welfare of the people ... is paramount to any rights under contracts between individuals").


## VIII. Claims under State Law

As indicated in the discussion of plaintiff's malicious prosecution claim, that claim fails both under federal and state law.  Whether presented as a claim under § 1983 or under New York law, it must be dismissed.

As to plaintiff's other claims under state law, including claims for slander, negligence, and intentional infliction of emotional distress, I decline to exercise supplemental jurisdiction over those claims, some of which involve legal and factual issues that would not necessarily be disposed of by the Court's rulings on plaintiff's § 1983 claims.  *See Matican v. City of New York*, 524 F.3d 151, 154-55 (2d Cir. 2008) ("if Matican has no valid claim under § 1983 against any defendant, it is within the district court's discretion to decline to exercise supplemental jurisdiction over the pendent state-law claims"); *New York Mercantile Exchange, Inc. v. IntercontinentalExchange, Inc.*, 497 F.3d 109, 118-19 (2d Cir. 2007) (because resolving plaintiff's state-law claims would have entailed resolving additional issues of fact, "dismissal of those claims after the federal claims had been dismissed [was] particularly appropriate"); *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("in the usual case in which all federal-law claims are eliminated before trial, the balance of factors ... will point toward declining to exercise jurisdiction over the remaining state-law claims") (quoting *Carnegie-Mellon Univ. v.  Cohill*, 484 U.S. 343, 350 n. 7 (1988)).

**CONCLUSION**

Defendants' motion for summary judgment (Dkt. #27) and supplemental motion for summary

judgment (Dkt. #44) are granted, and the complaint is dismissed.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
       May 18, 2009.